UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>  v.<br><br>JOSHUA JOHN HESTER (1),<br>MARCO MANUEL LUIS (5),<br><br>                    Defendants. | Case No.:  10cr2967 BTM<br><br>**ORDER RE RESTITUTION AS TO RANCHO SANTA FE LOANS** |
|---|---|

The Ninth Circuit remanded the restitution order (Doc. 773) previously entered in this case for recalculation of restitution as to the Rancho Santa Fe loans. <u>United States v. Luis</u>, 765 F.3d 1061 (9th Cir. 2014); <u>United States v. Hester</u>, 584 Fed. Appx. 805 (9th Cir. 2014).  After remand, the parties briefed the issue of what restitution, if any, was owed to JP Morgan Chase ("Chase"), and the Court held an evidentiary hearing on July 29, September 16-17, and December 16, 2015.  After considering the evidence presented and the relevant law, the Court determines that the government has not satisfied its burden of establishing that Chase suffered any loss on the loans that would entitle it to restitution.

//

//

## I. BACKGROUND

On March 19, 2012, defendant Marco Manuel Luis pled guilty to counts 16 and 25 of the indictment for conspiracy to engage in monetary transactions under 18 U.S.C. §§ 1957, 1956(h).

On January 3, 2012, defendant Joshua John Hester pled guilty to count 1 (21 U.S.C. §§ 841(a)(1) and 846 - Conspiracy to Manufacture and Distribute a Controlled Substance), counts 6-8 (21 U.S.C. § 856(a)(1) and 846) – Conspiracy to Maintain Drug-Involved Premises), count 15 (18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h) – Laundering Money; Conspiracy to Engage in Monetary Transactions), counts 16 and 25 (18 U.S.C. §§ 1957 and 1956(h) – Conspiracy to Engage in Monetary Transactions), and count 33 (18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h)- Laundering Money; Conspiracy to Engage in Monetary Transactions).

The money laundering charges arose from Luis and Hester's purchase of two properties using the proceeds of Hester's drug operation. In 2006, Luis and Hester purchased a parcel of property in Rancho Santa Fe, California for $2,050,000. Luis, who filled out the purchasing paperwork, listed Kelsey Weidenhoefer, Hester's girlfriend, as the purchaser of the property and falsely stated that Weidenhoefer was self-employed with an annual salary of $420,000 per year. Washington Mutual approved two mortgages in the amounts of $1,640,000 and $204,750.

1    In 2007, Luis and Hester purchased ten acres of real property in Palomar,
2  California for $560,000.  Again, Luis prepared the loan application, this time listing
3  Jay Hansen, Hester's courier, as the ostensible purchaser.  The paperwork falsely
4  stated that Hansen made $12,500 a month detailing cars.  CitiGroup approved two
5  mortgages in the amounts of $448,000 and $112,000.

6    The Palomar loans went into default in December 2008.  The Rancho Santa
7  Fe loans went into default in September 2009.  Subsequently, during a criminal
8  investigation of Hester's marijuana operation, it was discovered that the loans were
9  obtained fraudulently.

10    On August 27, 2012, Judge Gonzalez sentenced Luis to 48 months in
11  custody and also ordered restitution in the amount of $545,024.90, an amount set
12  forth in Luis's sentencing memorandum.  On September 5, 2012, Luis requested
13  that the restitution order be vacated and reconsidered.  Judge Gonzalez granted
14  this request and held a hearing at which witnesses from Chase and CitiGroup
15  testified.

16    At the hearing, Patrick M. Carr of Chase testified that Washington Mutual
17  Bank ("WaMu") was the originator of the Rancho Santa Fe loans in the amounts
18  of $1,640,000 (first mortgage) and $204,750 (second mortgage).  On September
19  25, 2008, the FDIC took possession of WaMu, and Chase simultaneously
20  purchased WaMu's assets and liabilities, including a group of loans, for $1.9 billion.

The group of loans, which included the Rancho Santa Fe loans, had an unpaid principal balance of 120 billion dollars. At the time of the purchase, the total principal balance on the Rancho Santa Fe property remained $1,844,750. In September 2011, Chase purchased the Rancho Santa Fe property for $1,228,815 at a foreclosure sale.

With respect to the Palomar Mountain loans, Judge Gonzalez found that CitiGroup's loss on both loans combined was $329,767.

With respect to the Rancho Santa Fe loans, Judge Gonzalez found that the loss to Chase on both loans was $615,935. Judge Gonzalez reached this figure by adding the principal balances owed on both loans ($1,640,000 on the first and $204,750 on the second), then subtracting the $1,228,815 Chase bid at the foreclosure sale.

Luis and Hester appealed the restitution order. The Ninth Circuit affirmed the calculation of restitution owed to CitiGroup on the Palomar Mountain loans but vacated and remanded for recalculation of the restitution owed to Chase. The Ninth Circuit explained that Judge Gonzalez had erred in calculating restitution based on the unpaid principal loan balance. Luis, 765 F.3d at 1067. Although the restitution formula for a loan originator begins with the amount of the unpaid principal balance due on the fraudulent loan, the restitution formula for a loan purchaser begins with "how much the victim paid for the fraudulent loan (or the

value of the loan when the victim acquired it)." Id. (quoting United States v. Yeung, 672 F.3d 594, 602 (9th Cir. 2012)).  Then the resulting amount is offset "by the amount of money the victim received in selling the collateral." Id. (quoting Robers v. United States, __ U.S. __, 134 S.Ct. 1854, 1856 (2014)).

Following Yeung, the Ninth Circuit held that because Chase purchased the loans and did not originate them, it was plain error for the district court to calculate restitution to Chase by subtracting the foreclosure sale price from the unpaid principal balances on the loans. Luis, 765 F.3d at 1067.  The Ninth Circuit vacated the restitution order as it applied to Chase and remanded "for the district court to recalculate Chase's loss, based on how much [Chase] paid for the fraudulent loan[s] (or the value of the loan[s] when [Chase] acquired [them])." Id. (internal quotation marks omitted).

## II. DISCUSSION

This Court has been directed to recalculate the restitution owed to Chase by determining Chase's loss based on either (1) how much Chase paid for the fraudulent loans; or (2) the value of the loans when Chase acquired them.  As discussed below, it is not possible to ascertain how much Chase paid for the Rancho Santa Fe loans.  As for the value of the loans when Chase acquired them, the government has failed to carry its burden of establishing that the value of the

loans was more than the purchase price at the foreclosure sale. Absent proof of loss by Chase, Chase is not entitled to restitution.

The government bears the burden of proof on the issue of how much, if any, restitution is owed to Chase. "The government bears the burden of proving that a person or entity is a victim for purposes of restitution . . . and of proving the amount of the loss, 18 U.S.C. § 3664(e)." United States v. Waknine, 543 F.3d 546, 556 (9th Cir. 2008) (internal citations omitted). "[A] dispute as to the proper amount of restitution must be resolved by the district court by a preponderance of the evidence." Id.

The parties do not dispute that it is not possible to ascertain how much Chase paid for the Rancho Santa Fe loans. Chase paid 1.88 billion dollars for all of the assets and liabilities of WaMu. The loans were part of the overall assets and liabilities, and no dollar amounts were applied to individual loans. (Carr Testimony, Tr. of 10/30/12 Hrg. at 32:18-21.)

Therefore, the Court must determine the value of the Rancho Santa Fe loans at the time Chase acquired them (September 25, 2008). The government takes the position that the value is the "book value," which equals the unpaid principal balances on the two loans. Defendants take the position that the value is the fair market value at the time Chase acquired the loans, which was substantially less than the unpaid principal balances. The Court agrees with Defendants.

For purposes of the instant inquiry, the fair market value of the Rancho Santa Fe loans on September 25, 2008, is determinative of Chase's loss, if any. In Yueng, the Ninth Circuit explained:

> Because the value of that loan is not necessarily its unpaid principal balance, but may vary with the value of the collateral, the credit rating of the borrower, market conditions, or other factors, the loan purchaser may have purchased the loan for less than its unpaid principal balance. . . . To calculate a victim's restitution award using the outstanding principal balance of the loan, if the victim only paid a fraction of that amount to obtain the loan on the secondary market, would cause the victim to receive an amount exceeding its actual losses.

Id. at 602.  Based on this language, the Court concludes that fair market value of the Rancho Santa Fe loans on September 25, 2008, is what is at issue.

The government argues that the value of the loans on September 25, 2008, was the "book value" of the loans, as defined by the Purchase and Assumption Agreement between the FDIC and Chase ("PAA"). (Gov't Ex. 4.)  Section 3.2 of the PAA provides that the assets purchased by Chase "shall be purchased for the amount, or the amount resulting from the method specified for determining the amount, as specified on Schedule 3.2, except as otherwise may be provided herein."  Schedule 3.2 indicates that loans are purchased at "Book Value."  "Book Value" is defined in the agreement as "the dollar amount thereof stated on the Accounting Records of the Failed Bank."  (PAA at 3.)  "Accounting Records," is defined as "the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances."  (PAA at 2.)

According to loan history documents (Gov't Exs. 11, 12, 17), when Chase acquired the loans, the outstanding principal balance for the first loan was $1,640,000, and the outstanding principal balance for the second loan was $204,750. All interest payments had been made on the loans, but no principal payments had been made. Wayne Green, a Financial Manager with the FDIC, testified that he viewed the loan history documents as "subsidiary ledgers." (Tr. of 9/16/15 Hrg. at 67:17.) Based on these accounting records, the government takes the position that the "book value" of the loans was the outstanding principal balances on the loans.

However, the Court is not convinced that the "book value" of the loans as defined by the PAA is the same thing as fair market value. Patrick Carr testified that there is a distinction between "book value" and "fair market value" and that in the case of the pool of loans obtained by Chase, the fair market value would be substantially less than the book value. (Tr. of 9/17/15 Hrg. at 33:16-34:1.) Carr conceded that there was no real market for individual loans at that time and that Chase bought the loans as part of a big overall transaction that made business sense to Chase. (Id. at 44:5-45:2.)

The evidence shows that the fair market value of the loans was likely significantly less than the outstanding principal balances. Upon acquisition of the Rancho Santa Fe loans, Chase designated them as credit-impaired. (Id. at 18:11-

19:15.) According to records in the possession of Chase, the loan-to-value ratio of the Rancho Santa Fe loans was over 100%, meaning the amount of the loans at the time was greater than the estimated value of the property securing them according to the Case-Shiller index. (Id. at 58:20-22; 64:2-8.) Furthermore, Chase performed a valuation of the 120 billion dollar pool of loans, focusing on September 25, 2008, and immediately took a 25% devaluation. (Id. at 34:4-8.)

The government's expert, Richard W. George, opines that the fair value of the Rancho Santa Fe loans should be the "book value" for the following reasons: the loans were performing at the time of acquisition; there was no evidence that WaMu was aware of any underlying flaw in the loans or had taken action to designate the loans as impaired; sales of properties in Rancho Santa Fe had evidenced no significant decline in property values up to September 28, 2008; Chase's 25% write-down was meant to reflect the total losses and expenses Chase expected to incur on the pool of loans, not any individual loan; Chase's losses on the loans were due to events that occurred subsequent to Chase's purchase of the loans; and the benchmark of sales prices to investors of residential properties is not applicable under the unique circumstances of Chase's acquisition of these loans. (Def. Ex. N.)

Although the S&P Case-Shiller index cannot be used to establish the value of individual property, it does provides general information about changes in the

value of residential real estate in designated areas. George opines that up to September 28, 2008, sales of properties in Rancho Santa Fe did not suffer from a significant decline in property values. However, the government did not present any reliable evidence in this regard. George testified that he had talked to a realtor with knowledge of the Rancho Santa Fe market, but the realtor did not take the stand.

The loans were "performing" in that the interest-only payments were current. But this circumstance would not prevent devaluation of the loans based on decreasing value of the collateral.

While it is true that the 25% "haircut" was applied to the pool of loans and is "imprecise," the fact that Chase immediately took a 25% devaluation indicates that Chase recognized that generally, the value of high LTV mortgages was falling significantly. Furthermore, although at the time of the acquisition it may have been "unknown what the impact of the Great Recession would be" (Def. Ex. N at 3), the nation was already in the throes of the financial crisis. The bursting of the housing bubble and the plummeting value of mortgage-backed securities had already caused great upheaval in the investment banking and mortgage banking industry. In March of 2008, Bear Stearns was rescued from bankruptcy by JP Morgan Chase and the Federal Reserve. In July 2008, Bank of America purchased the failing Countrywide Financial. In early September, the U.S. Department of Treasury took

over Fannie Mae and Freddie Mac.  In mid-September 2008, Bank of America agreed to purchase Merrill Lynch, Lehman Brothers declared bankruptcy, and the Federal Reserve provided an $85 billion bail-out to AIG.

Given the state of the financial market in 2008, the Court finds it hard to believe that the value of the Rancho Santa Fe loans would be the same as the unpaid principal balance.  Absent any specific evidence that property values in Rancho Santa Fe were insulated from the financial tumult of the time, the Court declines to adopt the government's position.[1]

Defendants' expert, Jan Ericsson, utilized two approaches to determining the market value of the Rancho Santa Fe loans.  (Ericsson Report, Def.'s Ex. L.) Under the first approach, Ericsson valued the loans on the assumption that the owner of the mortgage had decided to sell the loans as part of a bulk transaction to other market participants.  Ericsson estimated the proceeds of such a sale based on the market prices of default insurance on AAA-rated mortgage products at the time, as reflected by the ABX index, and concluded that the decrease in value of the two loans together would be near 50%.

Under the second approach, Ericsson estimated value of the loans based on

---

[1] Although the government claims Chase suffered a loss of $615,935, the Court notes that the government did not submit any accounting records of Chase documenting any claimed capital loss on the loans.  For example, there is no evidence Chase claimed a loss on these loans on its tax returns.

what a foreclosure sale of the property would have yielded compared to the outstanding loan amount.  This approach assumes that a hypothetical buyer of the mortgages would have had to consider a foreclosure as a highly likely event and would have priced the mortgages accordingly.  Ericsson estimated the proceeds of a foreclosure using a real estate index and a historical estimate of the cost of foreclosure.  Relying on the percentage change in the S&P Case Shiller index for the San Diego metropolitan region, Ericsson estimated the value of the Rancho Santa Fe property at $1,451,000.   Ericsson then considered three different scenarios accounting for the expected discount arising from the sale being a foreclosure:  a 10% discount, a 20% discount, and a 30% discount.  Under these scenarios, which also subtracted an estimated $50,000 in direct costs associated with foreclosures, the percentage of decrease in value of the first mortgage was 26-43% and the percentage of decrease in value of the second mortgage was 100%.[2]  Even under the most conservative scenario (10% discount), the market value of the first loan ($1,212,957) and second loan ($0) combined was less than the $1,228,815 purchase price at the foreclosure sale.

      The government protests that Chase was not a purchaser on the secondary

---

[2] Ericsson discounted the net realized sales prices back to September 25, 2008 at a rate of 3.57% (the one year LIBOR on that day) on the assumption that the sales prices were realized after an average time of one year.

12

10cr2967 BTM

market and emphasizes the unique circumstances of the FDIC takeover of WaMu and Chase's role in taking over WaMu's loan portfolio. Although Chase's acquisition was not a "business as usual" scenario, the Ninth Circuit has directed the Court to recalculate Chase's loss applying the loan purchaser restitution formula that looks to the value of the loans when Chase acquired them.

Even though Ericsson's second approach is hypothetical because there was no real market for individual loans in September 2008, the Court finds that his analysis provides a reasonable approximation of the fair market value of the loans. The government does not suggest any other method for valuing the loans at the time of acquisition beyond insisting that the fair value of the loans was the unpaid principal balance of the loans.

In sum, the Court rejects the government's position that the unpaid principal balance of the loans (or "book value") equals the fair market value of the loans and concludes that the government has not established by a preponderance of the evidence that Chase suffered any loss on the Rancho Santa Fe loans. Therefore the Court finds that no restitution is owed to Chase.

//
//
//
//

### III. CONCLUSION

For the reasons discussed above, the Court determines that Defendants do not owe any restitution to Chase.

**IT IS SO ORDERED.**

Dated:  December 30, 2015

_____
Barry Ted Moskowitz, Chief Judge
United States District Court